IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| **MARKAYLE GRAY,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No: _____ |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| **CHARLOTTE SECONDARY SCHOOL, INC., BOARD of DIRECTORS of CHARLOTTE SECONDARY SCHOOL INC.,** | ) |
| | ) |
| Defendants. | ) |

# COMPLAINT

Plaintiff **Markayle Gray** ("Plaintiff" or "Gray") brings this employment discrimination action for relief and damages against Defendant **Charlotte Secondary School, Inc.** ("Charlotte Secondary") and the **Board of Directors of Charlotte Secondary** ("Board of Directors") based on the following allegations and causes of action:

## NATURE OF THE ACTION

1. This civil rights lawsuit to correct unlawful race discrimination arises under 42 U.S.C.A. §§ 1981 and 1983 and Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C.A. § 2000e-3(a).

2. Plaintiff Markayle Gray, an African-American, was hired to teach English at Charlotte Secondary in the 2022-2023 academic year. Gray was a non-tenured contract employee.

3. Gray became another casualty of the book-banning sweeping American public education. He was fired, the principal of Charlotte Secondary all but admitted to him, because of a racially inspired backlash over his teaching of an award winning, mainstream novel about a black teenager's struggle to grasp racial injustice.

4. Gray brings this lawsuit to hold Charlotte Secondary and its Board of Directors accountable for their racially discriminatory conduct and to recover economic damages, including back pay, front pay, and lost benefits; noneconomic compensatory damages; and attorneys' fees and costs of litigation.

## THE PARTIES

5. Gray is a resident of Mecklenburg County in the state of North Carolina and was employed by Charlotte Secondary during the events alleged in the complaint.

6. Defendant Charlotte Secondary is a non-profit entity chartered by the state of North Carolina to provide a public education, subject to sue and be sued under the laws of North Carolina.

7. The bylaws of Charlotte Secondary vest the management of its affairs in a Board of Directors, which adopts the personnel rules, policies and procedures applicable to Charlotte Secondary. Defendant Board of Directors is an entity subject to sue and be sued under the laws of North Carolina, § 115C-218.20(a).

## SUBJECT MATTER JURISDICTION AND VENUE

8. Jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

9. Venue is proper in this district and division under 28 U.S.C.A. § 1391(b) as the alleged unlawful acts occurred in this district and division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Gray filed a charge of race discrimination against Charlotte Secondary with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2023-01673, on March 14, 2023.

11. Gray subsequently received a right-to-sue letter from the EEOC on March 20, 2023. A copy is attached as Exhibit A.

12. Gray timely files this action within 90 days of receiving his right-to-sue letter, and all administrative remedies have been exhausted prior to the filing of this civil action.

# FACTUAL BACKGROUND

13. Gray is a 2015 graduate of North Carolina Central University with a Bachelor of Arts degree in English.

14. Gray was hired in October 2022 to teach 7th and 8th grade English at Charlotte Secondary. Gray's employment was based on an annual contract subject to renewal by Charlotte Secondary at the end of the 2022-23 academic year.

15. Charlotte Secondary has a student population that is approximately 80-85% black, Hispanic, or biracial, but its teaching pool is split evenly between whites and people of color.

16. Charlotte Secondary touts its mission of empowering adolescents and teenagers in its marketing materials and in recruitment pitches to parents. Its published core principles proclaim that "Diversity is not merely desirable, it is necessary for the accomplishment of our mission."

17. Like other North Carolina charter schools, Charlotte Secondary maintains an approved curriculum. English teachers are obligated to obtain permission for their course offerings and their reading lists from their department head or the school principal, who during the 2022-23 academic year was Keisha Rock.

18. In the latter part of 2022 and early 2023, Gray obtained permission from Rock to build a lesson plan for his 7th Grade honors track class around the novel, "Dear Martin." The plan was designed to be a centerpiece of Gray's Black History Month activities for his students, and was initially assigned during January 2023.

4

19. The book "Dear Martin" was taken from a list of literary selections Rock had approved. In fact, Rock recommended the novel to Gray as a challenging but age appropriate work that promoted a discussion of core American values like justice and equality.

20. Published in 2017, "Dear Martin" was the debut novel of Nic Stone, a black woman who has become a rising star in the genre of young adult literature. The book features an Ivy League bound black teenager who is a victim of racial profiling: after being thrown to the ground and handcuffed during an encounter with a police officer, he conceives a set of ten imaginary letters to Martin Luther King Jr. in an effort to engage the question, "What would Dr. King do if he were alive today?"

21. "Dear Martin" has received commercial and critical acclaim. It rose to #4 on the prestigious New York Times Young Adult Hardcover Bestseller's List. Later, it reached #1 on the NYT Young Adult Paperback Bestseller's List. The novel has been favorably reviewed by nationally renowned publications like the Atlantic, which described it as a "brief but penetrating look at the mind of a black teenage boy coping with feelings of defeat and isolation." In addition, "Dear Martin" was a finalist for the William C. Morris Young Adult Debut Award and was named as one of the American Library Association's Top Ten Audiobooks for Young Adults.

22. In late January 2023, some white parents began to raise complaints to administrators at Charlotte Secondary that the content in "Dear Martin" was divisive

and injected what they regarded as unwelcome political views on systemic racial inequality into their childrens' classroom.

23. Charlotte Secondary is not customarily reluctant to engage culturally relevant topics. Teachers have generally been encouraged to promote equitable ideals in the context of race, gender, and sexual orientation with support from the school's administration even if the topics ventured into territory controversial for some parents.

24. But on February 2, 2023, Gray was informed by the school's principal Keisha Rock that his contract was being terminated effective immediately. The ostensible grounds, he was told, was the emergence of parental opposition over "Dear Martin" and other aspects of Gray's teaching content related to racial equality. As Rock stated, "I cannot address complaints made by parents all day."

25. Rock also told Gray that she had been in constant communication with the Board of Directors, "all day long", as she put it, which had also received parental complaints regarding Gray, and that the Board had authorized his immediate termination.

26. Charlotte Secondary sharply deviated from its normal protocols by terminating a teaching contract mid-year without a history of corrective action and without any evidence of school policies being violated by the teacher.

27. The Board of Directors of Charlotte Secondary has approved an employment handbook that puts in place a protocol for corrective action regarding

teachers: it refers to a progressive disciplinary approach that begins with verbal counseling, escalates to writeups and final warnings, before culminating in termination as a last resort.

28. Despite the guidance of the employee handbook, the corrective action protocol was not followed with respect to Gray.

29. In the context of instructional performance issues, Charlotte Secondary's process entails performance improvement plans, in which struggling teachers are engaged in a regular interactive process with administrators or senior teachers and assigned specific metrics for improvement.

30. Gray was not given the benefit of a performance improvement plan.

31. Charlotte Secondary School's employee handbook also establishes a conflict resolution method in the event of parental concerns around a teacher's actions: it focuses on administration managed dialogue between teachers and parents to find solutions.

32. As with its other departures from established school policies, Charlotte Secondary School abruptly bypassed its conflict resolution procedure and fired Gray instead.

33. In the same vein, firing Gray over a backlash at an approved curriculum tool is a radical departure from Charlotte Secondary's traditional practices. Gray has learned from colleagues that white teachers at the school have taught lessons that conveyed their views on politically polarizing topics from race to gender and sexual

orientation without encountering corrective action or discipline from the school's administration.

34. Charlotte Secondary has fielded complaints about multiple white teachers from black parents without taking any disciplinary or corrective steps, much less termination. The school's approach to dealing with such complaints from black families has consistently been to reassign the offended students to another teacher, even when one complaint involved a white arts teacher who made a racially insensitive comment about the color complexion of a black student.

35. Charlotte Secondary also took no steps to investigate or examine whether any of the parental opposition to Gray's teachings about systemic inequality might have been rooted in the parents' own racial bias or resentment.

36. Just a few weeks prior to his termination in mid January 2023, Gray had reported to school administrators that a white student who recently transferred into his class had made comments that some non-white students regarded as a product of racial animosity. That same student also openly violated school policies by using a cell phone to take pictures of audio-visual and written instructional materials in Gray's classroom.

37. When Gray reported this student's provocative conduct and his violations of policies to school administration, Charlotte Secondary took no steps to address the behavior. Gray observed that black students had been disciplined and threatened with suspension over the possession of phones in class.

8

38. The Principal of Charlotte Secondary, Keisha Rock, has acknowledged in conversations subsequent to Gray's termination that she also feared pressure from North Carolina's Department of Public Instruction ("DPI"), in that she knew a complaint had been circulated to DPI that a teacher at the school was teaching "Critical Race Theory". As Rock related it, "it was him [Gray] or me."

39. The term "Critical Race Theory" remains ill-defined but appears to include any method of instruction that describes the persistence of anti-black racism in American institutions.

40. The conduct of Charlotte Secondary's administration reflected a textbook racial double-standard: an African American teacher was swiftly terminated over parental concerns from whites, while white teachers have effectively been shielded from the complaints of black families.

41. The school's Board of Directors ratified or directed Gray's termination with full knowledge that its own personnel policies and procedures had been circumvented to the detriment of an African American teacher.

## CAUSES OF ACTION

### COUNT I

**( 42 U.S.C.A §§ 1981 and 1983)**
**(against the Board of Directors)**

42. Plaintiff Gray incorporates the foregoing allegations in paragraphs 1-41 as if fully restated herein.

43. 42 U.S.C.A. § 1981(a) prohibits race discrimination in the making and enforcement of contracts, including employment contracts.

44. Charlotte Secondary School, a non-profit entity chartered by the state of North Carolina to provide a public education, vests the management of its affairs in a Board of Directors, which adopts the personnel rules, policies and procedures applicable to Charlotte Secondary.

45. Acting under color of state law, the Board of Directors of the Charlotte Secondary Schools ratified or directly ordered the termination of Plaintiff Gray, a course of conduct the Board Members would not have undertaken but for Gray's race. The Board's actions violated Gray's clearly established right to be free from racial discrimination.

46. In order to vindicate the violation of his statutory rights protected under § 1981, Gray pursues this cause of action under 42 U.S.C.A. § 1983, which provides the exclusive remedy for the deprivation by a state actor of the rights guaranteed by § 1981.

47. As a result of the Board of Directors' racially discriminatory conduct, Plaintiff Gray suffered lost wages and benefits, as well as noneconomic compensatory damages, including mental anguish and emotional distress.

## COUNT II

**( 42 U.S.C.A. § 2000e-2(m))**
**(against Charlotte Secondary School, Inc. )**

48. Plaintiff Gray incorporates the foregoing allegations in paragraphs 1-47 as if fully stated herein.

49. Defendant Charlotte Secondary School terminated Plaintiff Gray from his employment for reasons at least partly motivated by race, in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C.A. § 2000e-2(m).

50. As a result of Charlotte Secondary's racially motivated conduct, Plaintiff Gray suffered lost wages and benefits, as well as noneconomic compensatory damages, including mental anguish and emotional distress.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff Markayle Gray demands a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits;

B. Compensatory damages to the extent allowed by law;

C. Punitive damages to the extent allowed by law;

D. Attorneys' fees and costs of litigation;

E. Prejudgment and post-judgment interest at the highest lawful rate; and

F. Such other equitable and monetary relief as the court deems just and proper.

Respectfully submitted on the 12th day of June, 2023.

**HKM Employment Attorneys LLP**

*s/Sunny Panyanouvong-Rubeck*
Sunny Panyanouvong-Rubeck
N.C. Bar No. 39966
1001 Elizabeth Avenue, Suite 1B
Charlotte, NC 28204
980-734-3851
spanyanouvong-rubeck@hkm.com

*s/Artur Davis*
Artur Davis[1]
ASB-3672-D56A
2024 3rd Ave. North, Suite 307
Birmingham, AL 35203
205-881-0935
adavis@hkm.com

Kendra Livingston[2]
GA Bar No. 791806
3344 Peachtree Road NE, Suite 800
Office # 835
Atlanta, GA 30326
Direct: 678-446-3016
klivingston@hkm.com

---

[1] Mr. Davis is admitted to practice law in Alabama and the District of Columbia and will promptly file a motion for admission *pro hac vice* pursuant to the Local Rules of the Western District of North Carolina.

[2] Ms. Livingston is admitted to practice law in Georgia and will promptly file for admission *pro hac vice* pursuant to the Local Rules of the Western District of North Carolina.