# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:23-CV-00347-MEO-DCK

|  |  |  |
|---|---|---|
| MARKAYLE GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | <u>MEMORANDUM & ORDER</u> |
| BOARD OF DIRECTORS OF | ) | |
| CHARLOTTE SECONDARY SCHOOL | ) | |
| INC. AND CHARLOTTE SECONDARY | ) | |
| SCHOOL INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Defendants Charlotte Secondary School, Inc. (the "School"), and Board of Directors of Charlotte Secondary School, Inc.'s (the "Board"), Motion for Summary Judgment. (Doc. No. 34). For the reasons explained below, the Court will grant Defendants' motion.

## I.     BACKGROUND

Plaintiff Markayle Graye initiated this lawsuit on June 12, 2023.[1] (Doc. No. 1). Plaintiff brings two claims: (1) race discrimination in violation 42 U.S.C. §§ 1981 and 1983 against the Board; and (2) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(m) against the School. (Doc. No. 1 at 9–11). On May 30, 2024, Judge Conrad adopted the Magistrate Judge's recommendation

---

[1] Plaintiff filed a charge of discrimination against the School with the EEOC on March 14, 2023. (Doc. No. 1 ¶ 10). The EEOC dismissed the charge and issued Plaintiff a right-to-sue letter on March 20, 2023. (Doc. No. 1-1).

and denied the Board's motion to dismiss.[2] (Doc No. 25). On March 7, 2025, Defendants filed a joint motion for summary judgment. (Doc. No. 34). On December 19, 2025, this case was reassigned to this Court. On April 23, 2026, this Court heard arguments on the motion.[3]

### A. The School

The School is a public charter school located in Charlotte, North Carolina. (Doc. No. 35-1; Ms. Rock Decl. ¶ 4). As a public charter school, the School is required to comply with various federal laws and state testing requirements. *Id.* ¶¶ 4–5. Specifically, the School must comply with certain legal requirements to provide accommodations to students consistent with those students' individualized education plans. *Id.* ¶ 4.[4]

The School utilizes an Employee Handbook (Doc. No. 43-2), which contains the following relevant provisions:

- "This Handbook is a collection of policies and in no way represents a contract of employment. All Charlotte Secondary School employees

---

[2] The School did not file a motion to dismiss. The Board argued in its motion to dismiss that under *Monell*, Plaintiff cannot establish the Board's liability. The M&R concluded that Plaintiff alleged the Board authorized the termination, thus satisfying a ratification theory of *Monell* liability. (Doc. No. 24 at 7). Neither party objected to the M&R and the Board did not renew this argument on summary judgment.

[3] After the hearing, Plaintiff filed a Notice of Supplemental Authority. (Doc. No. 53). This notice does not comply with LCvR 7.1(j), nor does it provide the Court with new authority. Rather, Plaintiff refers to portions of Ms. Rock's deposition transcript previously available to him to further his arguments. Nevertheless, consideration of this notice does not change the Court's analysis.

[4] The School must comply with the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act of 1973, requiring schools and teachers to provide accommodations to students consistent with their Individualized Education Plan ("IEP") or 504 Plan. (Doc. No. 35-1 ¶ 4).

are employed at will, which means that the School or the Employee *may terminate employment at any time and for any reason.*" *Id.* at 2 (emphasis added). Termination may occur "with or without notice." *Id.* at 9.

- "Employees will practice self-discipline to meet performance goals established by his/her supervisor. In the unlikely event that an employee fails to meet those standards, the school will provide coaching to assist the employee, counseling, and, in some cases, disciplinary action to change behaviors or mitigate arising circumstances." *Id.* at 95–96.

- Employees must "[l]earn from constructive criticism and accept coaching positively." *Id.* at 96.

- "Progressive discipline" used by the School includes various "kinds of actions, any of which are available for use at any starting point, alone or in succession," including termination. *Id.* at 97.

- "For serious offenses by an employee, such as . . . insubordination . . . , termination may be the first and only disciplinary step taken." *Id.* at 98.

- "Any step or steps of the disciplinary process may be skipped at the discretion of Charlotte Secondary School after investigation and analysis of the total situation, past practice, and circumstances." *Id.*

The Principal of the School during the relevant time was Keisha Rock, a black female. (Doc. No. 35-1 ¶ 2). As principal, Ms. Rock made all hiring and firing decisions while keeping the Board informed of her decisions. *Id.* ¶ 3. Ms. Rock had a goal to maintain the School's "C" grade it previously had achieved on the North Carolina Report Card. *Id.* ¶ 5.

Ms. Rock hired Plaintiff in October 2022 to teach seventh and eighth grade English Language Arts ("ELA"). *Id.* ¶ 6. Ms. Rock believed that Plaintiff "was knowledgeable regarding his responsibilities in providing modifications to students' work to comply with their [requirements] due to his previous experience teaching in

3

the Charlotte Mecklenburg public school system." *Id.* ¶ 7.

### B. Plaintiff's Work at the School

On October 10, 2022, Plaintiff began teaching at the School. (Doc. No. 35-1 ¶ 6). Claudia Evanich, the Exceptional Children ("EC") and English-as-a-Second-Language ("ESL") teacher at the School during the relevant time, co-taught with Plaintiff. (Doc. No. 35-2; Evanich Decl. ¶¶ 3–4). From the outset, Ms. Evanich observed that Plaintiff failed to provide the legally required accommodations or modified assignments to his ESL or EC students. *Id.* ¶ 6. Ms. Evanich attempted to help Plaintiff by providing him with instructions and training on modifications and accommodations, but Plaintiff failed to implement those recommendations. *Id.* ¶ 7.

In November 2022, Ms. Evanich began sharing her concerns about Plaintiff with Ms. Rock and her other supervisor, Ms. Miller, who also supervised Plaintiff. *Id.* ¶¶ 8, 11–12; (Doc. No. 35-8; Miller Decl. ¶ 3). The parent of a student in Plaintiff's class also complained about Plaintiff, expressing concern that her son, an EC student, was not receiving the appropriate modifications. (Doc. No. 35-3 ¶¶ 2,7); *see also* (Doc. No. 35-10).

To help the situation, Ms. Rock, alongside Ms. Miller, organized a professional development training for the entire staff, at which two EC teachers provided training on how to read IEP and 504 plans and provide accommodations based on the content of the document. (Doc. Nos. 35-1 ¶ 8; 35-8 ¶ 4). The training also included sample lessons to show staff how to modify assignments. (Doc. No. 35-1 ¶ 8).

After that training, Ms. Rock learned that Plaintiff's noncompliance continued.

*Id.* ¶ 10. Accordingly, Ms. Rock developed a plan for Plaintiff to meet with Ms. Evanich to go over his lesson plans so that Ms. Evanich could understand what he planned to teach and assist him in making any modifications or accommodations. *Id.*; (Doc. No. 35-2 ¶ 9). Plaintiff, however, rarely shared lessons with Ms. Evanich or would do fail to do so in a way that provided Ms. Evanich with sufficient time to review and assist as necessary. (Doc. No. 35-2 ¶ 9). Ms. Miller also began meeting with Plaintiff on a weekly basis to assist with his lesson plans as necessary. (Doc. No. 35-8 ¶ 5). Nevertheless, Plaintiff persisted in his noncompliance. *Id.*

### C. Plaintiff's Lessons and Parental/Student/Teacher Complaints

Shortly thereafter, in November 2022, Ms. Rock learned that Plaintiff was assigning students material inconsistent with their grade level. (Doc. No. 35-1 ¶ 11). One such book—*The Hate U Give*—is a high-school-level novel that Plaintiff assigned to his seventh-grade students. (Doc. Nos. 35-1 ¶ 11; 39-1 at 144:25–145:17; 39-2 at 126:7-25). When Ms. Rock learned that Plaintiff was teaching this book, she explained to Plaintiff why that book was inappropriate for his seventh graders and encouraged Plaintiff to instead assign *Dear Martin* to his seventh-grade students, which Plaintiff began teaching that same month. (Doc. Nos. 35-1 ¶ 11; 39-2 at 59:7–61:12 (describing *Dear Martin*); 127:1–10 (choosing *Dear Martin*); 129:10–17; 39-4 at 22:12–16 (Ms. Rock encouraging *Dear Martin*); 35-10). The state-education department lists *Dear Martin* as an approved novel. (Doc. No. 35-4 at 149:12–18). Plaintiff began teaching *Dear Martin* in late November. (Doc. No. 39-2 at 129:10–11).

Ms. Rock also received complaints from parents and students regarding the

subject matter of Plaintiff's teaching. (Doc. No. 35-1 ¶¶ 13–15). The reports included claims that Plaintiff's lessons were offensive and divisive and that he singled out white students to explain white privilege. *Id.* ¶ 15; (Doc. No. 35-4; Rock Dep. at 24:24–25:23); *see also* (Doc. No. 35-11) (March 2023 letter from parent); 35-2 ¶ 11). Parents and students of different racial backgrounds complained about the subject matter of Plaintiff's lessons. (Doc. No. 35-2 ¶ 11; 35-1 ¶ 13). A mother of one white student testified that her son became withdrawn and silent after Plaintiff singled him out in class for being white and having white privilege. (Doc. No. 35-5; Sutton Dep. 11:1–25, 62:2–23; 35-2 ¶ 11). Plaintiff disputes that he made any comments about the student's physical characteristics. (Doc. No. 35-6 at 15:2–9). According to Ms. Rock, none of the complaints had to do with the book *Dear Martin*. (Doc. No. 35-1 ¶ 12). Instead, Ms. Rock reported that the complaints concerned Plaintiff not teaching what Ms. Rock hired him to teach. *Id.*

Approximately twenty students, including white, black, and Hispanic students, went to Ms. Evanich and "expressed concern and discomfort with [Plaintiff's] teaching methodology which was dividing the classmates based on race."[5] (Doc. Nos. 35-2 ¶ 11). Generally, throughout Plaintiff's time teaching at the School, the students in his class were failing, despite having made progress during the previous school year. (Doc. Nos. 35-4; Ms. Rock. Dep. at 23:23–24:2; 35-1 ¶ 10).

A white teacher, Amanda Talbot, complained to Ms. Rock about Plaintiff saying, "if it was a white man, you would've fired him already," to which Ms. Rock

---

[5] While what the students said might be hearsay, the fact that students of various backgrounds complained to her is not.

responded that she was "handling it" because she was "not getting ready to share what's going on with him with another teacher or vice versa." (Doc. No. 39-1 at 29:14, 29:25–30:6). In fact, Ms. Rock testified that her thought at the time in relation to Ms. Talbot's comment was: "no, if it was a white man, I still wouldn't have fired him by now because I hadn't done everything I could to help him." (Doc. No. 39-1 at 30:9–11).

### D. January Meeting and Subsequent Events

On January 19, 2023, Ms. Rock met with Plaintiff during a principal-teacher conference to discuss the concerns raised by parents. (Doc. Nos. 39-1 at 173:7–174:3; 35-1 ¶ 17). Ms. Rock said the meeting was to "get [Plaintiff] to understand why it was an issue for that particular content to be taught. Not necessarily saying the content could not be taught, but being mindful of certain conversations that are triggering to students who cannot wrap their minds around them." (Doc. No. 39-1 at 173:14–19). Ms. Rock instructed Plaintiff "that his conversations around race were being misconstrued by the students because they are not mature enough to understand. [She] explained that the conversation he was trying to have regarding race would be more appropriate for older students." (Doc. No. 35-1 ¶ 17; 35-4 at 25:1–26:1; 35-6 18:17–19:13). Ms. Rock instructed Plaintiff to focus his lessons on the ELA content and standards. (Doc. No. 35-1 ¶ 17; Doc. No. 35-6 at 23:8–15). Ms. Rock reiterated that she "[did]n't disagree with his views" but that the middle schoolers would not "understand where you're going with it [and] will take what you're saying out of context." (Doc. No. 39-1 at 182:20–25).

During that time, Ms. Rock reached out to Mr. Sagoo, who was the board chair

at the time, to inform him of all that was happening. (Doc. No. 35-4 at 29:9–24; 39-3; Sagoo Dep. at 60:13–62:16). Ms. Talbot had separately informed Mr. Sagoo of some of the issues. (Doc. No. 35-4 at 29:13–24). Mr. Sagoo advised Ms. Rock at the time "to basically give [Plaintiff] a warning, advisement, document it and then just continue to monitor and see if the situation approves." (Doc. No. 39-3 at 64:17–21).

After that January meeting with Plaintiff, Ms. Rock learned the following. Plaintiff had failed to attend weekly meetings. (Doc. No. 39-1 at 22:18–23). Plaintiff was not providing students with appropriate grade-level assignments, or legally required accommodations, causing EC students to continue to receive failing grades. (Doc. Nos. 35-4 at 27:6–12, 268:14–271:20); *see also* (Doc. No. 43-3 ¶ 18). Plaintiff continued to ignore directives regarding the content of his classroom instruction and lessons. (Doc. Nos. 35-1 ¶ 20; 35-8 ¶ 8).

On January 25, 2023, Ms. Rock received an email complaint from a parent of one of Plaintiff's students, expressing his concerns about the content of Plaintiff's lessons. (Doc. No. 39-1 at 159:21–160:5; 163:2–164:7). Ms. Rock also learned that Plaintiff had taught a lesson on economic disparity, and she received a photo of Plaintiff's classroom board, which showed the focus of his lesson involved social justice, economics, and racial issues unrelated to the ELA curriculum. (Doc. Nos. 35-2 ¶ 13; 35-1 ¶ 20; 35-4 at 228:11–229:10). Despite Ms. Rock's previous instruction not to include racially charged content in his ELA classes, Plaintiff's classroom board contained words like "White World," "Slavery," "Red-Lining," and "Black Codes," among others. A reproduction of the photo of Plaintiff's classroom board is pictured

8

below.



(Doc. No. 35-9).

Plaintiff testified to the following regarding his lesson and what he had written

on the whiteboard that day:

- "[W]e had our literary text, Dear Martin. And then we had our informational text, inequality.org. . . . All of these were just topics related to inequality.org." (Doc. No. 35-7 at 44:25–45:2).

- "[A]rt imitates life and I was just pretty much like, this is pretty much a game, like the real estate industry, that's a game, you know, basketball is a game, NFL is a game, the music industry is a game. You have to learn how to play the game properly. And you learn how to play the game properly by educating yourself, you learn how to play the game properly by getting assets, you learn how to play the game properly by having a high network or a really good

9

network to increase your net worth. It's pretty much just a game, it's all a game." *Id.* at 50:11–23.

- Plaintiff clarified all that he touched on that day: "assets"; "the benefits of ownership, homeownership"; "owning real estate"; that "there are certain ZIP codes better than other ZIP codes from an economic, social economic standpoint"; "red lining"; "white flight"; "black codes"; "hip hop, rap"; "slavery . . . it all kind of derives back to that"; "white world"; "poll taxes"; "post construction"; "reconstruction"; "finances"; Plaintiff's own "goals in business"; etc. *Id.* at 44:23, 45:4–6, 46:6–8, 46:24–47:6, 47:15–24, 48:6, 48:14–22, 49:6–15, 49:19–24; 52:18–25.

(Doc. No. 35-12).

Based on the above, Ms. Rock determined that Plaintiff was insubordinate by continuing to teach the exact content that Ms. Rock had instructed him to stop teaching. (Doc. No. 35-4 at 70:11–71:1; 35-1 ¶ 20).

### E. Rock Terminates Plaintiff and Hires a Black Female to Replace Him

Ms. Rock ultimately made the decision to terminate Plaintiff but waited to do so until Plaintiff returned from a trip. (Doc. Nos. 35-4 at 229:20–230:4; 39-1 at 30:13–25; 35-1 ¶ 23). Defendants assert that Ms. Rock decided to terminate Plaintiff to keep the growth the students made in the prior school year and ensure their score on the North Carolina Report Card. (Doc. No. 35-1 ¶ 25; 35-4 at 31:4–18, 227:23–228:17). While Plaintiff was out, Ms. Rock worked with other teachers to print off Plaintiff's work, modify it, pull all the kids together, have them redo all the assignments, regrade all the assignments, and reenter the grades. (Doc. No. 35-4 at 27:13–25). Ms. Rock learned that upon Plaintiff's return, he collected students' cell phones and locked them in a box so they could not take pictures of the board. (Doc. Nos. 35-4 at 28:23–29:7; 35-1 ¶ 23).

On February 2, 2023, Ms. Rock texted Mr. Sagoo to inform him there had been another incident, that she planned to let Plaintiff go, and that the Office of Charter Schools supported the decision. (Doc. No. 39-3 at 62:18–24). Sagoo responded that he also supported the decision. *Id.* at 62:25. On or about that day, Ms. Rock met with Plaintiff to terminate his employment. (Doc. No. 39-2 at 145:1–6). The parties dispute what Ms. Rock said at that meeting. Ms. Rock says that based on her training, she provided intentionally vague reasons for the termination. (Doc. No. 35-4 at 238:8–25). Plaintiff disputes that, saying that Ms. Rock referenced parental complaints about *Dear Martin*, and that Ms. Rock never mentioned Plaintiff's attendance issues, failure to comply with IEP or 504 Plan requirements, or any other performance issues. (Doc. No. 39-2 at 145:14–146:17). Neither party provides any evidence of any discussions about Plaintiff's race except for the one comment Ms. Talbot made to Ms. Rock.

Ms. Rock hired a black female, Marina Thomas, to replace Plaintiff as teacher of the seventh and eighth grade ELA classes. (Doc. No. 35-1 ¶ 24). Ms. Rock subsequently reported the termination to the Board in a quarterly update. (Doc. No. 43-4).

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Va.,* 36 F.4th 240, 252 (4th Cir. 2022)

(quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Mod. Mosaic, LTD v. Turner Constr. Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *see also United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022) (same). "If the movant satisfies his initial burden to demonstrate 'an absence of evidence to support the nonmoving party's case,' the burden shifts to the nonmovant to 'present specific facts showing that there is a genuine issue for trial.'" *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021) (emphasis omitted) (quoting *Anderson*, 477

12

U.S. at 247–48). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, inter alia, "citing to particular parts of the materials of record," Fed. R. Civ. P. 56(c)(1)(A), and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *See Anderson*, 477 U.S. at 255. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (citation modified). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller *et al.*, Federal Practice & Procedure § 2728 (3d ed. 1998)).

Overall, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III. DISCUSSION

Defendants move for summary judgment on both of Plaintiff's claims. The

Court addresses each in turn.

### A. Count I: Plaintiff's § 1981/1983 Claim against the Board

Under Section 1981, "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987). "Thus, a person who experiences intentional race discrimination in private employment may pursue a 'federal remedy' under § 1981." *Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 170–71 (4th Cir. 2020), *as amended* (Oct. 16, 2020).[6]

Section "1981 follows the usual rules, not any exception. To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). "Without direct evidence of intentional discrimination, a plaintiff may use the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to develop an inferential case of discriminatory intent." *Lyons v. City of Alexandria*, 35 F.4th 285, 289 (4th Cir. 2022); *see Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 n.4 (4th Cir. 2025) ("While the *McDonnell Douglas* framework was initially developed for Title VII discrimination cases, it has since been held to also apply in discrimination cases

---

[6] Section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989).

14

arising under Section 1981.").

Having failed to present any direct evidence of discrimination, Plaintiff must proceed through the *McDonnell Douglas* framework, which comprises three steps: "(1) the plaintiff must establish a *prima facie* case of discrimination . . . ; (2) if the plaintiff presents *a prima facie* case, then the burden shifts to the defendant to show a legitimate non-discriminatory . . . reason for the adverse employment action; and (3) if the defendant shows such a reason, then the burden shifts to the plaintiff to prove that the reason is pretextual." *Sanders v. Tikras Tech. Sols. Corp.*, 725 F. App'x 228, 229 (4th Cir. 2018) (per curiam) (citing *McDonnell Douglas*, 411 U.S. at 802–04 and *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Lyons*, 35 F.4th at 289.

The elements of a prima facie case of discrimination are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)). As explained below, the Court concludes that Plaintiff fails to present sufficient evidence to create a genuine dispute as to the second or fourth element.

### i. *Satisfactory Job Performance*

Plaintiff fails to meet his burden under the second prong. "[T]o create a triable issue of fact as to satisfactory job performance, a plaintiff must demonstrate that he 'was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action." *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (second and third alterations in original). "Critically, under this element, '[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Id.* (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996), and *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)).

Here, Plaintiff does not present any evidence that he met the legitimate expectations of his employer. Instead, Plaintiff appears to rely on the absence of certain types of evidence to prove that he was meeting his employer's legitimate expectations. (Doc. No. 40 at 18). Plaintiff agrees that "insubordination and a failure to comply with the subject content for his courses could be indicative of performance issues," but he argues that if he had those issues, Ms. Rock would have raised them with Sagoo and followed the progressive discipline policy with proper documentation. *Id.* at 17–18. But the School's failure to follow its optional, discretionary disciplinary policies or repeat certain phrases to Plaintiff does not show that Plaintiff met Defendants' expectations. Ms. Rock emailed and met with Plaintiff to discuss the issues with the content of his teaching. And the evidence shows that Ms. Rock and other teachers attempted to help Plaintiff get back on track. When he refused to get

16

on track, Ms. Rock and those other teachers modified Plaintiff's work, had students redo their assignments based on the modifications, and then regraded his students. Plaintiff offers no evidence to rebut that, and no reasonable jury would conclude that Plaintiff met his employer's legitimate expectations.

### ii.    *Similarly Situated Comparators*

Even if Plaintiff showed he had performed his job satisfactorily, he fails to meet his burden under the fourth prong. "Courts frequently reframe the fourth element of a race discrimination claim pursuant to Title VII as 'similarly situated comparators.'" *Johnson v. Balt. City, Md.*, 163 F.4th 808, 815 (4th Cir. 2026). These are "similarly-situated employees outside the protected class [who] received more favorable treatment." *Id.* Under this prong, the Fourth Circuit has stated "that, as a general rule, Title VII plaintiffs must show that they were replaced by someone outside their protected class in order to make out a prima facie case." *Miles v. Dell, Inc.*, 429 F.3d 480, 486 (4th Cir. 2005) (noting "there may be exceptions to this rule in limited situations"); *accord Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 784 (4th Cir. 2023); *Kennedy v. Abbott Lab'ys, Inc.*, 654 F. Supp. 3d 512, 522 (E.D.N.C. 2023); *Pouncey v. Guilford Cnty.*, No. 1:18CV1022, 2021 WL 2649503, at *5 n.4 (M.D.N.C. June 28, 2021) ("The employee hired in Plaintiff's place was also African American, undermining any circumstantial presumption that race discrimination was a reason for her termination.").[7]

---

[7] At the hearing, Plaintiff argued that applying the Fourth Circuit's well-established law would be clear error in light of *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025). In *Ames*, the Supreme Court held that Title VII does not require majority-group plaintiffs to make a heightened showing of discrimination under the

Such limited circumstances that allow Plaintiff to establish a *prima facie* case despite this well-established rule include: (1) when "a significant lapse of time occurs between the adverse employment action and the decision to hire another person"; (2) "the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination"; or (3) when "the firing and hiring decisions were made by different decisionmakers." *Miles*, 429 F.3d at 486, 489. There is no evidence that any of these limited circumstances exists in this case.

Here, Ms. Rock, a black female, hired Plaintiff, a black male. Only four months later, Ms. Rock terminated Plaintiff. Ms. Rock then replaced Plaintiff with a black female, Marina Thomas. Absent "limited circumstances"—which Plaintiff fails to address—such a factual scenario undermines Plaintiff's *prima facie* case of discrimination.

Nor does Plaintiff present sufficient comparator evidence. "[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981). "[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019)

first step of the *McDonnell Douglas* framework. *Id.* at 313. That is not the issue here. Rather, the Fourth Circuit law, which has not changed since *Ames*, explains the inference against discrimination that arises when an employee is replaced by a person of the same race.

(alterations in original). "[T]o focus on one piece of the record without considering the whole would distort the permissible inferences to be drawn." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993).

Plaintiff's "comparator evidence" relies on Valerie Roundtree's affidavit that provides only hearsay and rumors. *See* (Doc. No. 39-4). Though she describes herself as having "personal knowledge" of three white teachers whom Ms. Rock did not terminate despite their alleged racially offensive remarks and actions or their failure to provide necessary learning accommodations, Ms. Roundtree fails to establish how she is "aware" of what happened. Nor does her affidavit say anything about how she gained this "knowledge" of the happenings with other teachers.

"Rumors, conclusory allegations and a plaintiff's subjective beliefs about the conduct of allegedly 'similarly situated' individuals 'are wholly insufficient evidence to establish a claim of discrimination as a matter of law.'" *Mbadiwe v. Union Mem'l Reg'l Med. Ctr., Inc.*, No. 3:05CV49-MU, 2007 WL 1219953, at *2 (W.D.N.C. Apr. 24, 2007), *aff'd sub nom. Mbadiwe v. Union Reg'l Med. Ctr.*, 265 F. App'x 147 (4th Cir. 2008); *see also Greensboro Pro. Fire Fighters Ass'n, Loc. 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995) ("[U]nattributed rumors . . . [are] neither admissible at trial nor supportive of an opposition to a motion for summary judgment."); *see also Evans*, 80 F.3d at 962 ("Federal Rule of Civil Procedure 56(e) specifically requires that affidavits submitted on summary judgment contain admissible evidence and be based on personal knowledge.").

Ms. Roundtree's affidavit fails to provide any admissible evidence of similarly

situated comparators. Even if the Court considered these rumors, Plaintiff, through Ms. Roundtree's affidavit or otherwise, fails to put forth any admissible evidence showing these white teachers engaged in similar conduct or involved similar circumstances as Plaintiff. In fact, the evidence does not indicate that Ms. Rock had any performance or insubordination issues with these teachers.[8] Alternatively, Ms. Rock received numerous complaints about Plaintiff from parents and teachers, and Plaintiff failed to positively respond to Ms. Rock's attempts to redirect him. Defendants put forth comparator evidence establishing that Ms. Rock did not use the Handbook's progressive discipline process for any of the terminations she conducted while teaching at the School. That three of the four teachers Ms. Rock terminated were black, without more, does not change the Court's analysis. (Doc. No. 39-1 at 113:7–117:22).

For these reasons, Plaintiff fails to present a genuine dispute as to whether he received different treatment from similarly situated comparators. He further fails to establish a prima facie case of discrimination when the same person who hired him, a member of his protected class, also fired him and then replaced him with a member of the same protected class shortly thereafter. Plaintiff fails to establish a genuine issue of material fact as to his Section 1981 claim, and summary judgment on that

---

[8] The evidence shows that prior to this litigation, Ms. Rock knew of only one complaint referenced in Roundtree's affidavit—that is, a complaint that Roundtree made to Ms. Rock about Mr. Rogers, a white social studies teacher. (Doc. No. 43-3 ¶¶ 4–6). Ms. Rock received no complaints from any parents or teachers regarding Rogers or any of the teachers Roundtree mentioned. *Id.* ¶¶ 10, 12, 14, 15.

20

claim is warranted in favor of Defendants.[9]

## B. Count II: Plaintiff's Title VII Claim against the School

Title VII makes it unlawful for an employer to discriminate on the basis of race. 42 U.S.C. § 2000e-2(a) ("Title VII"); *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024). "There are two traditional approaches to analyzing employment discrimination claims, historically referred to as the 'pretext' and 'mixed-motive' frameworks." *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 341 (4th Cir. 2008). Plaintiff is proceeding under Title VII's mixed-motive provision, codified at 42 U.S.C. § 2000e-2(m), which states that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

At the outset, Plaintiff offered what his counsel described as a textualist, "plain-language" interpretation of the mixed-motive provision of Title VII. Pointing to the text of § 2000e-2(m), Plaintiff argued without citation to authority that he need only show that the *subject* of race, not *his own* personal race, was a motivating factor for his termination. But "statutes are not read as a collection of isolated phrases." *SEC v. Pirate Inv. LLC*, 580 F.3d 233, 254 (4th Cir. 2009) (quoting *Abuelhawa v. United States*, 556 U.S. 816 (2009)). And as the pioneer of modern textualism, Justice Scalia, once observed, "In textual interpretation, context is everything . . . ." *See*

---

[9] Even if the Court were to consider Plaintiff's arguments regarding pretext, no reasonable jury would conclude that Plaintiff's termination was pretextual for the same reasons explained under the next claim, as those arguments are materially the same as Plaintiff's pretext arguments under Section 1981.

Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, *in* A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 3, 37 (Amy Gutmann ed., 1997). "Context also includes common sense, which is another thing that 'goes without saying.' Case reporters and casebooks brim with illustrations of why literalism—the antithesis of context-driven interpretation—falls short." *Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring). Plaintiff's literalist interpretation, while creative, fails to consider the statutory and common-sense context. In so doing, it conflicts with the governing interpretation of the law. A plain reading of Title VII makes clear that an individual must show discrimination on the basis of his race. *See, e.g.*, *Duvall v. Novant Health, Inc.*, 95 F.4th 778, 788 (4th Cir. 2024) (a mixed-motive plaintiff must show that "his protected characteristic" motivated the adverse employment decision). Any other interpretation would produce absurd results.

Turning to the merits of Plaintiff's claim, the Court observes that "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (en banc), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (first quoting *Reeves*

*v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000), then citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)). "To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that 'the protected trait . . . *actually motivated* the employer's decision.'" *Hill*, 354 F. 3d at 186 (citation omitted). This means that "[t]he protected trait 'must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'" *Id.*

By choosing to bring a mixed-motive claim, a plaintiff "faces 'a lessened causation standard' than but-for causation. For he need only provide sufficient direct or circumstantial evidence demonstrating that his protected characteristic was a *motivating factor* in the defendant's challenged employment practice. If he does so, 'the employer cannot escape liability.'" *Duvall*, 95 F.4th at 788 (first quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013), then citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003), then quoting *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 317 (4th Cir. 2005)). Indeed, "the impermissible factor need not have been the sole factor. As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice." *Diamond*, 416 F.3d at 318 (citing 42 U.S.C. § 2000e-2(m)). Overall, Plaintiff's "evidence must both display a 'discriminatory attitude' and bear a causal relationship with the adverse employment action." *Ousley v. McDonald*, 648 F. App'x 346, 349 (4th Cir. 2016) (per curiam).

To show that Plaintiff's race was a motivating factor for his termination,

23

Plaintiff points to: (1) Ms. Talbot's comment; (2) Ms. Roundtree's declaration; (3) the disciplinary steps Ms. Rock skipped before terminating Plaintiff; and (4) Ms. Rock's allegedly changing narrative for why she terminated Plaintiff. [10]

For the reasons explained below, Plaintiff's circumstantial evidence, when viewed in the light most favorable to Plaintiff, fails to provide "sufficient probative force to reflect a genuine issue of material fact." *Jacobs*, 780 F.3d at 577. Accordingly, because there is no genuine dispute of material fact whether Plaintiff's race motivated Defendants' decision to terminate him, summary judgment is required.

### i. *Duvall v. Novant Health*

Plaintiff cites *Duvall v. Novant Health, Inc.* to support his interpretation of Title VII. However, *Duvall* does not help Plaintiff. In *Duvall*, Novant abruptly terminated the plaintiff, a white male with a successful record as a marketing leader at Novant, after Novant had implemented a wide-scale Diversity and Inclusion (D&I) strategic plan to increase D&I across its executive and senior leadership teams. *Duvall*, 95 F.4th at 782–84. Novant continued to push its D&I initiative and discuss its impact on Novant's hiring practices even after terminating the plaintiff. *Id.* at 783. Novant promoted two females to replace the plaintiff, a white woman and a black

---

[10] Plaintiff primarily argued that the subject of race motivated Ms. Rock's decision to terminate Plaintiff. Specifically, Plaintiff argued that he presented direct evidence that racial factors motivated Ms. Rock's termination decision, those being "[Ms. Rock's] statement to Board President Sagoo that the basis for firing Gray was his teaching of Critical Race Theory and her narrative in the Board's personnel briefing that Gray's lessons included 'racially charged content.'" (Doc. No. 40 at 11). As discussed, the Court rejects Plaintiff's literalist interpretation of Title VII's mixed-motive provision, so it need not address those arguments. Even if considered, that evidence does not change the Court's analysis.

24

woman, and then hired another black female for the position. *Id.* at 786. Novant also gave "shifting, conflicting, and unsubstantiated explanations" for terminating the plaintiff. *Id.* at 790. The Fourth Circuit concluded that at trial, the plaintiff "presented sufficient evidence (direct or circumstantial) for a reasonable jury to have found that his race and/or sex played a motivating factor in Novant Health's decision to fire him." *Id.* at 788.

Here, there is no evidence that Defendants ever discussed Plaintiff's race or the race of any employee. Discussions and complaints regarding the content of Plaintiff's lessons never involved Plaintiff's race, the race of any teacher, or D&I initiatives. As discussed further below, Defendants did not present shifting and conflicting reasons for terminating Plaintiff. And most notably, Plaintiff was fired by Ms. Rock, a black female, and Ms. Rock hired a black female to fill his position. For these reasons, this case is quite different from *Duvall*. Further, the evidence in this case shows that Defendants relied only on factors other than Plaintiff's race—namely, his poor work performance and insubordination—in choosing to terminate him.[11]

### i. Talbot's Statement

Plaintiff's only purported "direct evidence" that Defendants discriminated against him on the basis of his race is the statement of Ms. Talbot, a white teacher at the school. The parties do not appear to dispute that Ms. Talbot complained to Ms.

---

[11] Similarly, this case is distinguishable from *Bandy v. City of Salem*, which Plaintiff also cites. 59 F.4th 705, 711 (4th Cir. 2023). *Bandy* involves direct evidence of discrimination under the ADEA, which employs a but-for standard. *Id.* For that reason, and because there is no evidence, direct or circumstantial, that Defendants made derogatory comments toward or about Plaintiff, *Bandy* is inapplicable here.

Rock about Plaintiff, saying "if it was a white man, you would've fired him already." (Doc. No. 39-1 at 29:14, 29:25–30:6). Ms. Rock responded that she was "handling it" because she was "not getting ready to share what's going on with [Plaintiff] with another teacher or vice versa." (Doc. No. 39-1 at 29:14, 29:25–30:6).

At the summary judgment hearing, Defendants argued Ms. Talbot's statement is hearsay, to which Plaintiff responded that he is not offering it for the truth of the matter asserted. Rather, Plaintiff asks the Court to credit Ms. Talbot's statement as to its effect on Ms. Rock. That is, that Ms. Talbot's statement led Ms. Rock to terminate Plaintiff because of, at least in part, his race. This is the only allegedly "direct evidence" that Plaintiff has put forth under the mixed-motive theory.

Ms. Talbot's statement is not direct evidence. "Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Matias v. Elon Univ.*, 780 Fed. App'x 28, 30 (4th Cir. 2019) (per curiam). This includes "evidence that the employer 'announced, or admitted, or otherwise unmistakably indicated that [race] was a determining factor' in the particular employment action." *Marlow v. Chesterfield Cnty. Sch. Bd.*, 749 F. Supp. 2d 417, 427 (E.D. Va. 2010) (quoting *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982)). "The kind of statements that suffice to show direct evidence of discrimination are those comments that do not require 'inference or presumption.'" *McLaughlin v. CSX Transp., Inc.*, 211 F. Supp. 3d 770, 779 (D.S.C. 2016) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989)).

Here, Ms. Rock did not make the statement at issue. Rather, Ms. Talbot said it to Ms. Rock. Giving weight to Ms. Talbot's comment requires the fact finder to presume or infer that Ms. Talbot's statement actually had an effect on Ms. Rock. This is far from direct evidence of discrimination. Even still, sufficient circumstantial evidence can establish a mixed-motive claim for discrimination. The problem with Ms. Talbot's statement is that it fails to provide even circumstantial evidence of discrimination. That is so because it requires assuming that Ms. Rock took Ms. Talbot's comment and then terminated Plaintiff, at least in part, so that others would not think she favors black teachers over white teachers. However, Ms. Rock denied at deposition that Ms. Talbot's statement had any impact on her decision to terminate Plaintiff (and her denial of the statement's purported impact on her is uncontradicted). "Such unsupported speculation or argument by counsel is not evidence to be considered at summary judgment and does not create issues of material fact." *Dean v. Philip Morris USA Inc.*, No. 1:02CV149, 2003 WL 21754998, at *5 (M.D.N.C. July 29, 2003).

Therefore, Ms. Talbot's statement, even in the light most favorable to Plaintiff, does not create a genuine dispute as to a material fact.

### ii. *After-the-fact and Varying Reasons for Termination*

Plaintiff points to Ms. Rock's reasons for terminating Plaintiff to show that she had a discriminatory motive.[12] An employer's "shifting, conflicting, and

---

[12] "Although cases in which the *McDonnell Douglas* framework is applied are sometimes referred to as 'pretext cases,' and we have no wish to change a quarter century of usage, it should be noted that questions of pretext may arise in any Title VII case, regardless of whether it is analyzed under *McDonnell Douglas*." *Costa v.*

27

unsubstantiated explanations for [the plaintiff's] termination . . . are indicative of pretext for unlawful discrimination." *Duvall*, 95 F.4th at 790 (citing *Jacobs*, 780 F.3d at 576). "In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes*, 922 F.3d at 225. "While an employer is certainly permitted to expand on its original reason for a termination, such evidence of substantial changes to [the employer's] proffered reason for the termination permits an inference of pretext." *Id.* at 226; *accord Duvall*, 95 F.4th at 791.

Plaintiff argues that Ms. Rock provided after-the-fact and varying reasons for termination. Plaintiff also argues that Ms. Rock did not use the word insubordination when she fired him nor did Ms. Rock ever discipline Plaintiff. (Doc. No. 40 at 20–21). Plaintiff also points to Ms. Rock's failure to reference the "ELA guidelines at three separate intervals—her communications with Mr. Sagoo in late January 2023, the Board briefing about personnel actions, or the meeting notifying [Plaintiff] of his firing." (Doc. No. 40 at 12).

Here, the undisputed evidence shows that Ms. Rock attempted to correct Plaintiff's lessons and coach him on modifications after receiving numerous complaints about the topics of his lessons, but Plaintiff continued to teach subjects that Ms. Rock told him to avoid. Her choice to use words other than "insubordination" when she terminated Plaintiff does not mean that her reason for termination

---

*Desert Palace, Inc.*, 299 F.3d 838, 857 (9th Cir. 2002), *aff'd*, 539 U.S. 90 (2003); *see also Duvall*, 95 F.4th at 788–91 (analyzing pretext under the mixed-motive framework).

28

changed—that Plaintiff ignored her coaching and direction.

To the extent that Plaintiff argues that Ms. Rock gave "after-the-fact rationales," such as the fact that Plaintiff "taught outside the approved lines of his approved curriculum or that his topics were inappropriate for the age of his students," the evidence shows that Ms. Rock brought up these issues to Plaintiff prior to his termination. (Doc. No. 35-6 at 4:18–24, 18:17–25, 23:8–24); *see also* (Doc. No. 39-3; Sagoo Dep. at 61:13–62:1 (Ms. Rock mentioned same issues to Mr. Sagoo). Thus, Ms. Rock's reasons for terminating Plaintiff did not substantially change over time, and to the extent that Ms. Rock discovered additional issues with Plaintiff as she investigated the situation, those do not indicate pretext.

For these reasons, Plaintiff's evidence, when viewed in the light most favorable to Plaintiff, does not create a genuine issue of material fact about whether Defendants discriminated against him, nor does the evidence show how the reasons for his termination are "inconsistent over time, false, or based on mistakes of fact." *Haynes*, 922 F.3d at 225.

### iii.    *The Handbook*

The parties do not dispute that Ms. Rock did not use progressive discipline as outlined in the Handbook to terminate Plaintiff. Rather, Plaintiff argues that a jury can infer a discriminatory motive from Ms. Rock's failure to do so. *See* (Doc. No. 40 at 13) (citing Doc. No. 36 at 6, 10). Plaintiff also argued at the hearing that the lack of a paper trail, primarily from the lack of progressive discipline, leads to an inference that Ms. Rock considered Plaintiff's race when deciding to terminate him.

29

"Evidence that a company failed to follow its own disciplinary policies in firing an employee can also be probative of pretext." *Wannamaker-Amos,* 126 F.4th at 260 (citing *Cowgill v. First Data Tech., Inc.*, 41 F.4th 370, 383 (4th Cir. 2022), and *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 728 (4th Cir. 2019)). "That is because an employer's 'extreme overreaction' to a minor infraction may suggest that the relevant decisionmaker was 'looking for a reason to get rid of [the plaintiff]' on discriminatory grounds." *Wannamaker-Amos,* 126 F.4th at 260. But "[t]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent." *Russell v. Harlow*, 771 Fed. App'x 206, 207–08 (4th Cir. 2019) (per curiam) (quoting *Vaughan v. Metrahealth Cos.*, 145 F.3d 197, 203 (4th Cir. 1998)). "Instead, 'there must be some evidence that the irregularity directly and uniquely disadvantaged a minority employee.'" *Russell*, 771 Fed. App'x at 208 (quoting *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1213 (10th Cir. 2010) (concluding that failure of employer to follow policy as to all applicants did not show pretext)).

Here, Ms. Rock testified, and Plaintiff has not provided any evidence to the contrary, that she did not follow the formal progressive discipline policy for any of the teachers she terminated during her time as head of school in accordance with her training. (Doc. No. 35-4 at 259:25–261:20). Thus, Plaintiff fails to show how he was uniquely disadvantaged. Further, the Handbook grants Ms. Rock discretion in determining whether to use progressive discipline by allowing the employer to skip any step and jump to termination for serious offenses—which may occur with or

without notice. (Doc. No. 43-2 at 9, 98); *see, e.g., Ogedegbe v. Town of Leesburg*, No. 1:24-CV-1897-MSN-LRV, 2026 WL 252518, at *10 (E.D. Va. Jan. 29, 2026) (finding failure to follow policy not pretextual because the "policy did not prohibit Plaintiff's termination or require progressive discipline, and Plaintiff does not show how his termination is not proportional to the seriousness of his conduct"). Lastly, Ms. Rock tried to coach and redirect Plaintiff before terminating him. Thus, Plaintiff fails to present evidence to create an inference of discrimination regarding Ms. Rock's failure to utilize a discretionary progressive discipline policy.

### iv.    *Roundtree Declaration*

For the same reasons already discussed, Plaintiff fails to provide admissible comparator evidence as to whether Plaintiff was treated differently from white teachers.

Ms. Roundtree also describes in her affidavit that she expressed her concerns to Ms. Rock after Plaintiff's termination, and Ms. Rock said "that there were things about the dismissal that [she] didn't know, such as the fact that a white teacher at CSS had gone to the state charter school board that oversees CSS and reported Gray's teaching content, and that state authorities had contacted her about [Plaintiff], and that she believed she was going to be fired if something was not done about him." (Doc. No. 39-4 ¶ 11). While this statement involves a direct conversation Ms. Roundtree says she had with Ms. Rock, which Ms. Rock disputes, *see* (Doc. No. 43-3 ¶ 17), it does not provide any evidence from which a reasonable jury would conclude that Ms. Rock fired Plaintiff because of, in whole or in part, his race.

Accordingly, Ms. Roundtree's affidavit fails to establish a genuine issue of material fact as to whether Defendants discriminated against Plaintiff on the basis of his race. Nor does any of the evidence, when viewed together and in the light most favorable to Plaintiff, show that Plaintiff's race motivated Defendants' decision to terminate him. For these reasons, summary judgment in favor of Defendants is warranted on Count II.

## IV. CONCLUSION

Overall, "[r]egardless of the type of evidence offered by a plaintiff as support for [a] discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill*, 354 F.3d at 286 (citations omitted).

In construing the facts and reasonable inferences in the light most favorable to Plaintiff, Plaintiff has failed to show that there is a genuine issue of material fact such that a reasonable jury would conclude that Defendants discriminated against Plaintiff because of his race under either Title VII or Section 1981. Accordingly, the Court grants summary judgment in favor of Defendants.

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 34) is **GRANTED** and the Clerk is directed to close this case.

**SO ORDERED.**

Signed: May 12, 2026

Matthew E. Orso
United States District Judge